UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA,  :

     Plaintiff,  :

           :  **MEMORANDUM AND ORDER**

    -against-  :  08-CR-133 (DLI)

           :

William Feliz,  :

           :

     Defendant.  :

-------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

  Defendant William Feliz is charged with distributing and conspiring to distribute over one kilogram of heroin in violation of 21 U.S.C. § 841(a)(1). He seeks to suppress all of the evidence recovered from his vehicle when the police stopped him after he changed lanes without signaling. Defendant does not deny the traffic violation. Instead, he contends that the police searched his vehicle without probable cause, thereby violating his rights under the Fourth Amendment. The government opposes the motion, arguing that the police had probable cause to search the vehicle based on its narcotics investigation and surveillance of defendant leading up to the search. Additionally, the government contends that the search fell within the plain view exception to the Fourth Amendment's warrant requirement.[1]

---

[1] The government also claims that, under *Michigan v. Long*, 463 U.S. 1032 (1983), "the officers were entitled to perform the equivalent of a pat-down of the passenger compartment during the traffic stop to make sure that there was no weapon within the reach of [defendant], who the officers knew was the target of a narcotics investigation." (Opp'n at 9.) The court need not resolve this issue as it finds that there was probable cause for the search under the collective knowledge doctrine and the plain view exception.

For the reasons set forth more fully below, defendant's motion is denied in its entirety.

## BACKGROUND

### I.    The Motion to Suppress

In support of its motion, defendant submitted: (1) the citation for the traffic violation, (Def.'s Ex. A); (2) the investigation report of the Philadelphia Police Department, (Def.'s Ex. B); (3) the November 14, 2007 Preliminary Hearing Transcript of Officers Farrell and Iezzi's testimonies before the Municipal Court of Philadelphia, (Def.'s Ex. C); and (4) a Declaration from defendant.  In opposition, the government submitted documents relating to its investigation of the narcotics conspiracy, including the wiretap applications, agent affidavits, and court orders dated June 5, 15, and 22, 2007.

After reviewing the submissions, the court found that a suppression hearing was necessary.  Specifically, these submissions raised the following factual disputes relating to the plain view exception: (1) whether the police officers were able to see through the tinted windows of defendant's vehicle during the traffic stop; (2) whether a black bag completely covered the narcotics; and (3) whether the police uncovered the narcotics by entering the vehicle.  Furthermore, the submissions did not set forth the government's investigation of defendant immediately prior to his arrest, and therefore, the court was unable to determine whether the investigation established probable cause for the July 11, 2007 search.

## II.  The Suppression Hearing

To resolve the discrepancies in the evidence and to determine the extent of the government's investigation of defendant leading up to the July 11, 2007 arrest, the court held a suppression hearing on September 10, 2009.[2]  Officers Thomas Farrell, Joseph Rapone, and Graziano Iezzi of the Philadelphia Police Department testified as did Special Agent Luis Infante of the Drug Enforcement Administration ("DEA").  Defendant did not testify.  The court found the testimonies of Rapone, Iezzi, and Infante to be entirely credible.

Although Farrell's testimony conflicted with his prior testimony in state court and with Rapone's testimony on a few minor details, the court found most of his testimony credible.  Those inconsistencies are explainable and immaterial, and therefore, they do not alter the court's decision.  The arrest occurred over two years ago.  Rapone testified that he has made hundreds of arrests since then.  (Tr. at 67.) Furthermore, the stop and search occurred "very fast": Rapone and Farrell pulled defendant over "within a few seconds."  (Tr. at 76-77.)  It took another "few seconds" for the officers to get out of their squad car and approach defendant's vehicle.  (Tr. at 76-77.)  Once they arrived at the vehicle, approximately ten to fifteen seconds passed before Rapone noticed the narcotics.  (Tr. at 77.)  Defendant has not challenged any of these assertions.  Under these circumstances, the court is not surprised that there are a few minor inconsistencies between the officers' recollections.

---

[2]  "Tr." refers to the transcript of that hearing.

Rapone, Farrell, and Iezzi gave the same account of the key facts: (1) on July 10, 2007, the DEA asked Rapone and Farrell to assist with a narcotics-related surveillance of defendant; (2) Rapone and Farrell assisted with the surveillance; (3) defendant changed lanes without signaling in violation of a traffic law; (4) during the ensuing traffic stop, Rapone and Farrell, using their flashlights, looked through the rear tinted windows and saw narcotics on the floor behind the passenger seat; and (5) they observed the narcotics before either of them opened a door of the vehicle or entered the vehicle. Accordingly, unless otherwise indicated, the court credits the statements that are set forth below.

## A. Farrell's Testimony

On the evening of July 10, 2007, Officers Farrell and Rapone, who were then members of the Philadelphia Highway Patrol, were on duty from 6:00 P.M. to 2:00 A.M. on July 11, 2007. (Tr. at 12.) Farrell testified that, at approximately 11:00 P.M., Iezzi, on behalf of the DEA, requested assistance with "taking down" a Lincoln Town Car that was possibly transporting narcotics. (Tr. at 12-13, 22-23.) According to Farrell, Iezzi explained that the DEA had been surveilling the vehicle, and Iezzi instructed him to stop the vehicle only if it committed a traffic violation. (Tr. at 13-14, 23-24.) Iezzi provided a dedicated radio for the task. (Tr. at 45.) Subsequently, Iezzi informed Farrell that the vehicle was traveling north on Interstate 95. (Tr. at 15.)

Farrell and Rapone saw the vehicle travelling on Interstate 95 between 12:45 A.M. and 12:50 A.M. on July 11, 2007 and followed it. (Tr. at 15, 24.) Farrell

observed that the vehicle was traveling at approximately 45 to 50 miles per hour, which was under the posted speed limit. (Tr. at 15, 25.) After following the vehicle for approximately half a mile, Farrell observed the vehicle change lanes without signaling. (Tr. at 15, 26.) Farrell and Rapone then pulled the vehicle over for violating Pennsylvania Motor Vehicle Code § 3334(a), changing lanes without signaling. (*Id.*)

Farrell approached the vehicle from the driver side while Rapone approached from the passenger side. (Tr. at 16, 26.) Farrell asked defendant to lower his windows, and defendant lowered both of the front windows. (Tr. at 16, 26-27.) The rear windows remained shut. (Tr. at 16.) All of the windows were slightly tinted, and Farrell was able to see through the windows while shining his flashlight. (Tr. at 17.) The interior lights of the car were also lit. (*Id.*)

Farrell informed defendant that he had failed to signal before changing lanes. (*Id.*) He then asked defendant for his license, registration, and insurance. (*Id.*) Farrell testified that "[he] didn't view [defendant] as a threat to [his] safety," and "there was nothing that [defendant] was doing which in any way indicated that he might be armed or dangerous[.]" (Tr. at 29.)

While Farrell was inspecting the documents, he heard Rapone ask defendant if there was any contraband in the vehicle that they needed to know about. (Tr. at 17) Defendant replied, "Somebody left something in the back seat, I don't know what it is." (*Id.*) Farrell then shined his flashlight through the rear window on the driver side. (Tr. at 18.) He saw a pair of knee-length shorts with sewn-in pockets

on the floor behind the passenger seat. (Tr. at 18-19.) The shorts were on top of a briefcase. (Tr. at 38.) The shorts were folded in half with the sewn-in pockets visible. (Tr. 19-20.) The "glassy" reflection of the light on the sewn-in pockets indicated to Farrell that the pockets contained packages of narcotics. (Tr. at 20, 37.) Farrell reached this conclusion based on his extensive experience with drug-related activity, including about 300 narcotics arrests. (Tr. at 20-21.)

The government introduced a photograph of a pair of black shorts with many sewn-in pockets on the exterior. (Tr. at 18, 20.) Farrell identified it as the shorts he observed in defendant's vehicle, and the court admitted the picture as Government's Exhibit 1. (Tr. at 20.) The photograph corroborates Farrell's description of the shorts—in particular, the packages of narcotics within the sewn-in pockets are partially visible through the fabric, and they give off a glossy white reflection. (Gov't Ex. 1.)

Farrell testified that Rapone also saw the shorts. (Tr. at 21.) Farrell asked defendant about the shorts, inquiring whether it was the item that defendant claimed that someone had left in his vehicle. Defendant confirmed that it was. (*Id.*) Then Farrell arrested defendant. (Tr. at 21.) When the DEA arrived at the scene five minutes after the stop, Farrell gave the shorts to the DEA. (Tr. at 21-22.)

### B.   Rapone's Testimony

Rapone's testimony corroborated most of Farrell's testimony about the search. On the evening of July 10, 2007, he and Farrell were on highway patrol duty. (Tr. at 49-50.) Around 11:00 P.M. that evening, the DEA asked them to

"takedown" a black Lincoln Town Car, which meant that the officers were to stop the vehicle only if they observed a traffic violation. (Tr. at 50, 58, 60.) The DEA provided a dedicated point-to-point radio for the task. (*Id.*) The DEA explained that the vehicle was the target of a narcotics investigation. (Tr. at 50.) The officers located and followed the vehicle on Interstate 95 North in Philadelphia. (*Id.*) Rapone observed that the vehicle changed lanes without signaling. (Tr. at 51.) Rapone then contacted the DEA over the radio and explained that defendant had committed a traffic violation. (*Id.*) The DEA instructed Rapone to pull defendant over, and the officers complied. (*Id.*)

Farrell approached the driver side window as Rapone positioned himself at the rear of the passenger side. (Tr. at 52.) Rapone could not hear Farrell's conversation with defendant because of the highway noise. (Tr. at 52.) Both rear windows were tinted and completely rolled up. (Tr. at 53.) In describing the tint, Rapone explained that "[w]ith the naked eye[,] you could see certain things. Once you get the flashlight and move closer and look into the vehicle[,] you can see inside the vehicle." (*Id.*)

Rapone testified that he always carries a very bright flashlight, and, when he pulls over a vehicle, he shines the flashlight into the vehicle. (Tr. at 52-53.) Rapone had his flashlight (a Maglite) at the hearing and demonstrated its exceptional brightness for the court. (Tr. at 54.) Following his usual practice, Rapone moved his face and flashlight close to the rear passenger side window of defendant's vehicle. (*Id.*) He saw "clear plastic packaging" behind some material on an item on

the rear floor of the passenger compartment. (Tr. at 54, 65.) Based on his 16 years of police experience, which included hundreds of narcotics arrests, and the information from the DEA, Rapone concluded that the item contained narcotics. (Tr. at 56, 70-71.) At this point, all of the car doors remained closed. (Tr. at 54-55.)

Rapone then asked defendant, "[I]s there anything inside this vehicle that I need to know about?" (Tr. at 55.) During this questioning, Rapone rested his wrists on the lower frame of the window, and his hands were the only part of his body that were inside the vehicle. (Tr. at 68-70.) According to Rapone, defendant responded that someone had been in the back of the vehicle and that person may have left something. (Tr. at 55.) Rapone testified that "defendant [was then] taken out of his vehicle." (*Id.*) Once defendant was outside the vehicle, one of the officers removed the item containing the narcotics, which Rapone identified as the shorts pictured in Government's Exhibit 1. (Tr. at 55-56, 68.)[3]

## C. Iezzi's Testimony

Iezzi's account of the events of July 10 and 11, 2007 was entirely consistent with Rapone's testimony. Iezzi's testimony was also consistent with Farrell's account with the exception of one detail: Iezzi testified that defendant was outside the vehicle when the officer on the passenger side of the vehicle removed the shorts.

---

[3] Although Rapone testified on direct examination that he removed the shorts, on cross-examination, he admitted that he did not recall whether he or Farrell removed the shorts. (Tr. at 55, 67-68.) Whether Rapone or Ferrell removed the shorts does not alter either the court's analysis or conclusion as to the admissibility of the shorts and narcotics.

(Tr. at 113, 116.) Farrell, on the other hand, had testified that defendant was in the vehicle when the shorts were removed. (Tr. at 21.)

On July 10, 2007, the New York Division of the DEA asked Iezzi to maintain surveillance on a black Lincoln Town Car that was possibly transporting narcotics. (Tr. at 80-81, 110.) Iezzi began surveilling the vehicle between 5:00 P.M. and 6:00 P.M. that day. (Tr. at 81.) Approximately eight to ten officers and agents participated in the surveillance. (Tr. at 82.) The members of the surveillance team kept each other apprised of the vehicle through a DEA radio. (Tr. at 85.) They informed Iezzi that the vehicle traveled between various parts of Philadelphia, including various parking lots, and the driver met with two unidentified individuals. (Tr. at 83-84, 91.) At 10:15 P.M., members of the surveillance team observed the vehicle in the parking lot at 1651 Columbus Boulevard by a Wal-Mart and a Home Depot. (Tr. at 87.) Those agents also saw a white Toyota Camry there. (Tr. at 88.) An unidentified male walked from the Camry to the vehicle and spoke with defendant. (*Id.*) That individual then returned to the Camry and drove off. (Tr. at 89.)

Sometime around 10:30 P.M. or 11:00 P.M., Iezzi met with two officers of the Philadelphia Highway Patrol. (Tr. at 94.) Iezzi did not recall the officers' names. (*Id.*) He handed them a DEA radio and informed them about the surveillance of defendant's vehicle and explained that the vehicle was the target of a narcotics investigation. (*Id.*) Iezzi instructed them to "maintain a close surveillance," and stated that the "vehicle may have to be stopped for investigation." (*Id.*)

That evening, the officers began following the vehicle on Interstate 95 North. (Tr. at 95.) Iezzi was in a vehicle about five to ten car lengths behind the officers. (*Id.*) Iezzi testified that the vehicle was traveling at "no more than 45 miles per hour." (*Id.*) He witnessed the vehicle change lanes without signaling. At this time, Iezzi was approximately 400 feet behind the officers. (Tr. at 109.) The officers then told him that they also had observed the traffic violation, and all agreed that Rapone and Farrell should stop the vehicle. (Tr. at 95.) Rapone and Farrell then stopped the vehicle, and Iezzi parked his vehicle at least 500 feet behind them along the same side of the road. (Tr. at 96.)

He saw the officers approach the vehicle—with one on the passenger side and the other on the driver side—and they looked inside the vehicle with their flashlights. (*Id.*) One of the officers then removed defendant from the vehicle, and the other officer thereafter retrieved a large black item from the back seat area of the vehicle. (Tr. at 96, 113.) Defendant "was then handcuffed and placed in the back seat of their marked unit." (Tr. at 96.)

The officers then contacted Iezzi over the radio and informed him that they had retrieved the contraband. (Tr. at 97.) Iezzi walked up to the vehicle, inspected the contraband, and informed the rest of the surveillance team about the arrest. (Tr. at 98.) The officers gave Iezzi the contraband. (*Id.*) Iezzi identified the contraband as the shorts depicted in Government's Exhibit 1. (Tr. at 98-99.) Iezzi also testified that Government's Exhibit 1 accurately portrayed the shorts as it appeared at the time of the arrest. (Tr. at 99.) The government introduced, and

Iezzi identified, a photograph of 62 plastic-wrapped bundles of white powdery substance that the police found sewn into the outside of the shorts. (Tr. 100-01, Gov't Ex. 3.) Iezzi explained that his field test revealed that the substance was for heroin. (Tr. at 101.)

### D.    Infante's Testimony

Infante testified about his participation in a joint New York and Houston DEA investigation into a Houston based heroin and cocaine trafficking organization that was distributing narcotics in the New York area. The investigation involved the use of court-authorized wiretaps. Defendant was a target of that investigation. (Tr. at 135.) Infante's testimony focused primarily on the investigation on July 2 and 10, 2007.[4]

#### 1.    July 2, 2007

On July 2, 2007, the DEA was surveilling Jhon Jaime Murillo, another target of the investigation. (Tr. at 135.) Infante had received information from the DEA field division in Houston that another suspected member of the conspiracy, Diego Arias, had ordered Murillo to receive drugs in the New York area that day. (*Id.*) The surveillance lasted from approximately "the early morning hours all the way until possibly the following morning or later that night." (*Id.*) During the surveillance, Infante observed Murillo leave his home in Pelham, New York, and

---

[4] The court, with the consent of the parties, incorporated by reference the wiretap applications and orders issued by the Hon. Sandra Townes of this court as setting forth a more detailed background of the investigation leading to the arrest and indictment of defendant. Upon review of said applications and orders, this court found that there was sufficient probable cause for their issuance.

enter a white Toyota Camry with Texas license plates that had a partial expiration date of July 20. (Tr. at 136.) Murillo visited several locations, including an auto parts store, before returning to his home in Pelham. (Tr. at 136-37.) A short time later, Murillo left with Lucio Carasco, another alleged co-conspirator, and they drove a rented sports utility vehicle ("SUV") to a deserted parking lot. (Tr. at 137.)

The agents surveilling Murillo approached the SUV to conduct a search. (*Id.*) They obtained consent for the search, and using a canine unit, they identified packages of white powdery substances, which were "a positive hit for the presence of narcotics . . . ." (*Id.*) The agents then arrested Murillo and Carasco. (Tr. at 138.) Shortly afterwards, the agents released them because the field test of the seized packages was negative for narcotics. (*Id.*) However, this result turned out to be incorrect. Based upon certain intercepted calls between Murillo and Arias, the agents believed that the powdery substances recovered contained a mixture of cocaine and non-controlled substances. A subsequent examination by the DEA Northeast Laboratory of the entire recovered substance revealed that half of the seized substance (approximately 996 grams) was heroin. (*Id.*)

### 2.    July 10, 2007

On July 10, 2007, Infante was monitoring the movements of defendant's vehicle by tracking a Global Positioning System (GPS) that was attached to the vehicle. (Tr. at 139.)[5] According to the GPS, defendant had driven to the vicinity of

_____

[5] It is undisputed that the DEA placed the GPS on the vehicle pursuant to a warrant issued by a magistrate judge of the United States District Court for the Southern District of New York. (Tr. at 9-10; *see also* May 23, 2007 Aff. and

the shipping ports in Philadelphia. (*Id.*) Based on the investigation, Infante knew that the organization had previously sent Murillo and other co-conspirators to pick up drugs at those shipping ports. (Tr. at 140.) At the time, Infante did not know who was driving the vehicle. (*Id.*) In the past, the DEA had seen defendant and Murillo drive the vehicle. (Tr. at 140, 146-47.)

Upon Infante's request, field agents then established visual surveillance of the vehicle. (Tr. at 141.) After moving around Philadelphia and stopping in various parking lots, defendant arrived at a shopping center parking lot and pulled up next to a white Toyota Camry with temporary Texas license plates and a partial expiration date of July 20, the same vehicle Murillo had driven a few days before, on July 2, 2007. (Tr. at 141-42.) An unidentified male exited the Camry and entered defendant's vehicle. (Tr. at 142.) The unidentified male then returned to the Camry and both vehicles left the parking lot in separate directions. (*Id.*) Defendant then drove to another parking lot where a second unidentified male entered his vehicle and then exited after a few minutes. (*Id.*) Subsequently, defendant met up again with the white Toyota Camry. (*Id.*) After that, the vehicles split up and defendant drove around Philadelphia before heading north on Interstate 95. (Tr. at 142-43.) Based on this activity, Infante believed that defendant was in Philadelphia to pick up narcotics and the individuals he met with may have given him the narcotics. (*Id.*)

---

Application to Monitor a Mobile Tracking Device; June 28, 2007 Application to Extend Use and Monitoring of a Mobile Tracking Device.)

At this point, the DEA in New York was not prepared to arrest everyone in the conspiracy. (*Id.*) Thus, to keep the other members of the drug organization from becoming aware of the investigation, which included wiretaps, Infante wanted to arrest defendant in a way that would not disclose the larger investigation. (Tr. at 143-44.) To accomplish this, Infante informed the local police to pull over the vehicle only if defendant committed a traffic violation. (Tr. at 143, 153-54.)

## CONCLUSIONS OF LAW

### I. Under the Collective Knowledge Doctrine, the DEA's Narcotics Investigation Provided Probable Cause for the Search.

Probable cause for a search exists "when there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (citation and internal quotation marks omitted). "[P]robable cause is a flexible, common-sense standard . . . [and] the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Texas v. Brown*, 460 U.S. 730, 742 (1983) (citation and internal quotation marks omitted). The government bears the burden of establishing probable cause. *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008) (citation omitted).

Generally, the police must obtain a warrant before conducting a search. *California v. Carney*, 471 U.S. 386, 390-91 (1985). Over eight decades ago, however, the Supreme Court recognized an exception to this requirement for the searches of automobiles. *See Carroll v. United States*, 267 U.S. 132, 153 (1925). Under this automobile exception, "where there was probable cause to search a vehicle a search

is not unreasonable if based on facts that would justify the issuance of a warrant, *even though a warrant has not been actually obtained.*" *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (citation and internal quotation marks omitted) (emphasis in original). The automobile exception "does not have a separate exigency requirement: If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." *Id.* (citation and internal quotation marks omitted) (alteration in original). "The mere inherent mobility of the vehicle is sufficient to constitute the 'ready mobility' the automobile exception recognizes." *United States v. Howard*, 489 F.3d 484, 494 (2d Cir. 2007).[6]

"Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation." *United States v. Colon,* 250 F.3d 130, 135 (2d Cir. 2001); *see also Illinois v. Andreas,* 463 U.S. 765, 771 n.5 (1983) ("[W]here law enforcement authorities are cooperating in an investigation, as here, the knowledge of one is presumed shared by all."). Under Second Circuit precedent, application of this doctrine "requires that at some point along the line, some law enforcement official—or perhaps some agglomeration of

---

[6] Thus, defendant's argument—that the automobile search cannot be justified absent exigent circumstances—is baseless. (*See* Def.'s Sept. 18, 2009 Letter Brief at 6.)

such officials—involved must possess sufficient information to permit the conclusion that a search or arrest is justified." *Colon,* 250 F.3d at 136; *see also United States v. Santa,* 180 F.3d 20, 28 (2d Cir. 1999) (noting that "imputation of knowledge from one police officer to another" requires that officers be "working on the same case").

Here, it is undisputed that, at the time of the search, Farrell and Rapone were assisting the DEA in its investigation of defendant's drug activities. Rapone and Farrell both testified that the DEA, at around 11:00 P.M. on July 10, 2007, asked them to follow defendant's vehicle and stop it if it committed a traffic violation. (Tr. at 12-14, 22-24, 50, 58-60.) Iezzi testified that around 10:30 P.M. or 11:00 P.M. on July 10, 2007, he instructed two officers of the Philadelphia highway patrol to "maintain a close surveillance" and that the "vehicle may have to be stopped for investigation." (Tr. at 94.) Infante also confirmed that he asked local police officers to pull over defendant's vehicle only if it committed a traffic violation. (Tr. at 143-44.) Therefore, under the collective knowledge doctrine, Farrell and Rapone are deemed to know everything the rest of the agents and officers working on the investigation knew.

This collective knowledge established probable cause for the search. Infante testified that, on July 2, 2007, the DEA arrested Murillo and Carrasco with close to one kilogram of heroin. (Tr. at 137-38.) In the surveillance leading up to that arrest, the DEA observed Murillo in a white Toyota Camry with a temporary Texas license plate that expired on July 20. (Tr. at 136.) The DEA believed that the Camry belonged to Roberto Torre Martinez, another suspected co-conspirator. (Tr.

at 142-44.)  The DEA had previously observed Murillo driving defendant's Lincoln Town Car.  (Tr. at 140, 146-47.)

On July 10, 2007, GPS surveillance located defendant's vehicle in the vicinity of the shipping ports in Philadelphia, where members of the drug organization previously had picked up narcotics.  (Tr. at 139-140.)  Defendant then drove to a deserted parking lot where he met with an unidentified male driving a Toyota Camry matching the description of the vehicle that Murillo had driven immediately before the July 2, 2007 arrest.  (Tr. at 94, 141-42.)  After driving away and meeting with another unidentified male in an empty parking lot, defendant met again with the unidentified male driving the Camry.  (*Id.*)  Under these circumstances, there was a "fair probability" that defendant had met with one of Murillo's associates in the drug organization in order to transport drugs from Philadelphia to New York. Therefore, under the collective knowledge doctrine, Rapone and Farrell had probable cause to stop and search the vehicle.

## II.    The Plain View Exception Applies.

Even if the DEA investigation did not establish probable cause, the search still would have been justified because the narcotics were in plain view.  The plain view exception to the Fourth Amendment's presumptive warrant requirement "authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity."  *Illinois v. Andreas,* 463 U.S. 765, 771, (1983). An officer may seize evidence in plain view if:

"(1) the officer's initial intrusion was permissible under the fourth amendment; (2) the discovery of the evidence is inadvertent; and (3) the incriminating nature of the evidence is immediately apparent." *United States v. Jenkins,* 876 F.2d 1085, 1088 (2d Cir. 1989), *cert. denied* 502 U.S. 1014 (1991) (citations and internal quotation marks omitted).

The government has satisfied the first part of the test. The Second Circuit has established that "an observed traffic violation legitimates a stop even if the detectives do not rely on the traffic violation." *United States v. Dhinsa*, 171 F.3d 721, 725 (2d Cir. 1999); *see also United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) ("Although Scopo's traffic violation, failure to signal while changing lanes . . . was minor, the officers acted within their authority in stopping Scopo for violation of the state law.").[7] Farrell, Rapone, and Iezzi testified that they observed defendant change lanes without signaling, and defendant admits committing the traffic violation. (Tr. at 15, 51, 95; *see also* Def. Ex. C at 5, 24-25; Def. Decl. at ¶ 2.) The traffic citation and investigation report corroborate the testimonies. (Def. Exs. A & B.) Furthermore, during a traffic stop, an officer may shine his flashlight into the vehicle. *See Texas v. Brown*, 460 U.S. 730, 739-40 (1983) ("It is likewise beyond dispute that Maple's action in shining his flashlight to illuminate the interior of Brown's car trenched upon no right secured to the latter by the Fourth Amendment.").

---

[7] Under Pennsylvania law, changing lanes without signaling is a traffic violation. 75 Pa.C.S.A. Vehicles § 3334(a).

The discovery of the narcotics was "inadvertent" and the illegal nature of the contraband was "immediately apparent." Rapone testified that he always looks into a vehicle with his flashlight during a traffic stop. (Tr. at 52-53.) Rapone testified that, during this routine inspection, when he shined his flashlight through the rear passenger-side window of defendant's vehicle:

> I could see on the right floor, floor board or the floor mat there was an object, I don't know what it was but I could see as I moved my light closer to the window and my face closer to the window, I could see that—I could see clear plastic packaging behind this material. . . . [B]ased on my 16 years of police experience I knew right then and there it was narcotics, based on the information I had prior to the stop and based on the packaging and with my light I was looking and my seeing it with my own two eyes I knew it was narcotics. . . . I've made hundreds of narcotics arrests in the city of Philadelphia.

(Tr. at 54, 56.) Rapone then asked defendant, "is there anything inside this vehicle that I need to know about?" (Tr. at 55.) Defendant responded that someone who had been sitting in his back seat may have left something. (*Id.*) Upon hearing this, Farrell looked through the rear driver-side window with his flashlight and saw the shorts. He testified that

> As I was standing outside the vehicle, as I shined my flashlight on the pants, you could actually see how it illuminates the packaging of the controlled substance inside it and you could see it, I knew it at the time and during my years of doing this kind of stuff I could tell it was narcotics inside of the pants. . . . [A]s a member of the Highway Patrol we did several—we do several takedowns with the DEA, we work with them, we're known[sic] what to look for. . . . [I've made] probably about 300 . . . [narcotics arrests in the past].

(Tr. at 20-21.)

Rapone was the first to find the shorts, and he did so inadvertently while shining his flashlight from outside the vehicle as is his usual practice during traffic

stops. Furthermore, the court has reviewed a picture of the shorts. (Gov't Exs. 1, 3.) It had 62 plastic-wrapped packages of heroin sewn into the outside of it. Notably, the packages had a shiny or glossy appearance through the material. Given their extensive experience with narcotics arrests, the court credits Rapone and Farrell's testimonies that they knew that the shorts contained narcotics as soon as they saw it.

Defendant contends that: (1) the tint of the rear windows "ma[de] it impossible to see inside the car when the window is closed"; (2) Rapone would not have discovered the shorts if he had not improperly entered the vehicle and searched through garbage that was on the floor of the vehicle; and (3) the black bag completely covered the shorts. (Def. Decl. at ¶¶ 3, 5.) The court is unpersuaded by these implausible contentions set forth only in defendant's declaration. Both officers used their flashlights to see through the tinted windows into the rear of the car. Iezzi corroborated that both officers used their flashlights to look into the vehicle. (Tr. at 96.) Rapone explained that his flashlight is an extremely bright Maglite. After being temporarily blinded by Rapone's in-court flashlight demonstration, the court concurs. (Tr. at 53-54.) Rapone also explained that he saw the shorts when he pressed his face and light very close to the window. Farrell testified that the interior lights were on, and defendant has not denied this assertion. (Tr. at 17; *see also* Def.'s Decl.) Under these circumstances, the court credits Rapone and Farrell's testimonies that they could see through the tinted windows with their flashlights.

The court also finds it unlikely that, prior to discovering the shorts, Rapone had leaned his upper body into the vehicle to search through garbage and food on the floor of the front passenger seat. Defendant was a livery driver of a Lincoln Town Car. (Mot. to Suppress at 2.) As noted by Rapone, the court finds it implausible that defendant would allow garbage and food to collect in his car. Therefore, the court credits Rapone's responses to the following questions:

> Question: Do you recall at any point while the defendant—while the driver was still in the car, opening the front passenger door and looking through garbage that had collected in the front, on the front floor of the passenger compartment?
> Answer: Your Honor, this was no trash truck, this was a limousine and there was no trash in the vehicle.
> Question: You don't recall looking through bags of food or things like that in the car?
> Answer: No.

(Tr. at 71.)

Finally, defendant argues that the shorts were underneath a black bag on the floor behind the passenger seat. (Reply at 4; Def. Decl. at ¶ 5.) Defendant claims that Rapone first saw the black bag while searching through the garbage and food in his car, and "it wasn't until after [Rapone] moved the black bag that he first saw the shorts." (Def. Decl. at ¶ 5.) Given that the court has already found that Rapone did not lean into the vehicle to search through the garbage and food, the court also cannot credit defendant's allegation that Rapone discovered the black bag during that search and subsequently removed the bag to uncover the shorts. Moreover, Rapone and Farrell testified that they were able to see the shorts through the window. At the state-court proceedings and before this court, Farrell testified that

the shorts were on top of the black bag.  (Def.'s Ex. C at 11; Tr. at 38.)  In light of the testimony and submissions as well the court's credibility findings, the court credits Farrell and Rapone's testimonies.  Accordingly, the court finds that Farrell and Rapone had probable cause for their search under the plain view exception to the Fourth Amendment's warrant requirement.

## CONCLUSION

For the reasons set forth above, defendant's motion is denied in its entirety.

SO ORDERED

DATED:      Brooklyn, New York
            September 28, 2009

_____/s/_____
DORA L. IRIZARRY
United States District Judge
